# In the United States Court of Federal Claims

No. 17-67

(Filed: May 29, 2019)

```
*************************************
                                    *
UNITED AFFILIATES CORPORATION       *
AND MINGO LOGAN COAL LLC,           *
                                    *
            Plaintiffs,             *    Fifth Amendment Taking;
                                    *    Categorical Taking; Regulatory
v.                                  *    Taking; Clean Water Act; Motion
                                    *    to Dismiss for Failure to State a
THE UNITED STATES,                  *    Claim; Rule 12(b)(6); Rule 9(i).
                                    *
            Defendant.              *
                                    *
*************************************
```

*Kevin P. Holewinsky*, Jones Day, Washington, D.C., for Plaintiff United Affiliates Corporation, and *Robert M. Rolfe*, and *George P. Sibley II*, Hunton & Williams LLP, Richmond, Virginia, for Plaintiff Mingo Logan Coal LLC.

*Joshua P. Wilson*, with whom was *Jean E. Williams*, Deputy Assistant Attorney General, Natural Resources Section, Environmental & Natural Resources Division, U.S. Department of Justice, Washington, D.C., for Defendant.

OPINION AND ORDER

WHEELER, Judge.

Before the Court is Defendant's motion to dismiss Plaintiffs United Affiliates Corporation's ("United") and Mingo Logan Coal LLC's ("Mingo") complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Court. The Environmental Protection Agency ("EPA") issued a permit pursuant to section 404 of the Clean Water Act allowing certain mining-generated waste disposal operations. The agency then withdrew that permit. Plaintiffs allege that the EPA's permit withdrawal constituted a categorical and regulatory taking of their property under the Fifth Amendment. The Government submits that Plaintiffs fail to allege a compensable property interest and cannot state a categorical takings claim as a matter of law. For the reasons explained below, the Court GRANTS

Defendant's motion to dismiss Count I of Plaintiffs' complaint and DENIES Defendant's motion to dismiss Count II.

Background

United owns the surface and most of the mineral rights within a mining region of West Virginia known as Spruce No. 1.  Compl. ¶¶ 1, 13.  Mingo entered into a long-term lease with United to operate a surface coal mine on United's property.  Id. ¶¶ 1, 14, 20.  United is entitled to royalties from Mingo based on the amount of coal mined.  Id. ¶ 1.

As part of its mining operations, Mingo removes excess rock and dirt from the surface (called "spoil" or "overburden") to access the coal underneath.  Id. ¶ 17.  Some spoil is returned to the mined area or repurposed for separate development projects.  Id.  The remaining spoil is placed in areas adjacent to the excavation site, areas known in the region as "hollows".  Id. ¶ 18.  Occasionally, these hollows contain "waters of the United States".[1]  Id.  Pursuant to section 404 of the Clean Water Act, 33 U.S.C. § 1251, *et seq.*, miners looking to dispose of spoil in a hollow containing "waters of the United States" must first obtain a permit from the EPA ("section 404 permit" or "permit").  Id. ¶ 19.

The Pigeonroost Branch and Oldhouse Branch streams run through the hollow where Mingo sought to dispose of its spoil.  The EPA has classified both waterways as "waters of the United States".[2]  Id. ¶ 43.  Accordingly, Mingo applied for a permit in 1997, and the EPA approved Mingo's application in 2007.  Id. ¶¶ 2, 42.  The permit did not list United as a permittee.  Id. ¶ 42.  Mingo then began preparing the area to begin mining operations, a process which allegedly cost Mingo millions of dollars.  Id. ¶¶ 49, 69.

In 2009, President Obama's new administration sought to tighten regulations on coal mining.  Id. ¶¶ 50-60; id. Ex. A.  Pursuant to that policy shift, the EPA overhauled its section 404 permit application and review process, subjecting applicants to a stricter set of standards.  Id. ¶ 50.  The EPA began expressing concerns with Plaintiffs' operation under these new standards, and it officially withdrew the permit on January 13, 2011.  Id. ¶ 63.  According to Plaintiffs, this action marked the first time that the EPA had ever rescinded an already-issued section 404 permit.  Id. ¶ 61.

Mingo then challenged the EPA's decision to rescind its permit as arbitrary and capricious in violation of the Administrative Procedures Act in the U.S. District Court for the District of Columbia and later, the D.C. Circuit.  The D.C. Circuit ultimately disagreed with Mingo, finding the EPA's permit withdrawal to be "reasonable, supported by the

---

[1] The EPA can deem an area "waters of the United States" under the Clean Water Act without the location being a waterway in the traditional sense.  For example, areas that are dry for most of the year, but which carry storm runoff or operate as a seasonal stream can qualify.  Id. ¶ 18.

[2] In this Opinion, the Court refers to the two waterways at issue as "streams."  This linguistic choice does not reflect an evaluation of the legal nature of these areas, but rather is for ease of reference.

record, and based on considerations within the agency's purview." Mingo Logan Coal Co. Inc. v. EPA, 70 F. Supp. 3d 151, 154 (D.D.C. 2014), aff'd sub nom. Mingo Logan Coal Co. v. EPA, 829 F.3d 710 (D.C. Cir. 2016).

On January 13, 2017, Plaintiffs filed a two-count complaint in this Court. Count I alleges that the EPA's permit withdrawal was a categorical taking of Plaintiffs' property. Count II alleges that the EPA's permit withdrawal constituted a regulatory taking of Plaintiffs' property.[3] The Government moved to dismiss Plaintiffs' complaint on December 20, 2018. The Government asserts that Plaintiffs fail to state a claim because they (1) fail to allege a compensable property interest, and (2) advance a categorical taking claim that is unsupported by precedent. The matter was fully briefed on March 20, 2019, and the Court heard oral argument on April 10, 2019.[4]

Discussion

A. Standard of Review

When considering a motion to dismiss a complaint for failure to state a claim upon which relief may be granted under Rule 12(b)(6), the Court must accept as true all factual allegations submitted by the plaintiff. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). While factual allegations are entitled to the assumption of truth, courts are not "bound to accept as true a legal conclusion couched as a factual allegation." Id. Accordingly, for the plaintiff to survive dismissal, the Court must conclude that "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). The plaintiff's factual allegations must be substantial enough to raise the right to relief above the speculative level, accepting all factual allegations in the complaint as true and indulging all reasonable inferences in favor of the non-movant. Twombly, 550 U.S. at 545; Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 938 (Fed. Cir. 2008).

B. Plaintiffs' Fifth Amendment Takings Claims

The Fifth Amendment to the U.S. Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. A takings claim is evaluated under a two-part analysis. "First, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to

---

[3] This case was stayed from March 28, 2017, to October 29, 2018 while the parties explored the possibility of resolving Plaintiffs' claims. See Dkt. Nos. 11, 29.

[4] At oral argument, the Court gave Plaintiffs leave to file a supplemental brief in response to authority that the Government cited during oral argument that was not included in its brief. Plaintiffs filed that response on April 16, 2019. See Dkt. No. 16.

3

be the subject of the taking.  Second, if the court concludes that a cognizable property interest exists, it determines whether that property interest was 'taken.'" Acceptance Ins. Cos., Inc. v. United States, 583 F.3d 849, 854 (Fed. Cir. 2009) (citations omitted).  Therefore, to state a claim, Plaintiffs must only plead facts that, when accepted as true, show that they hold a property interest, and that the Government took that interest.

1. Property Interest

Defendant makes three challenges: (1) Rule 9(i) of the Court establishes a heightened pleading standard for Fifth Amendment takings claims which Plaintiffs have not met; (2) regardless of whether a heightened pleadings standard exists, Plaintiffs' claims fail because they do not allege ownership over the hollows regulated by the section 404 permit; and (3) Plaintiffs allege no state law property right that would allow them to dispose of spoil in "waters of the United States".[5]

a. Rule 9(i)

Rule 9(i) requires that plaintiffs "pleading a claim for just compensation under the Fifth Amendment . . . must identify the specific property interest alleged to have been taken by the United States . . . ."  The Government argues that this imposes a more exacting pleading requirement than traditional notice pleading standards on those bringing a takings claim.  Not so.  Rule 9(i) recasts the familiar two-part test for takings (possession of a cognizable property interest and a taking of that interest) so as to guide a prospective plaintiff's pleading.  Accordingly, Rule 9(i) applies the familiar Twombly and Iqbal notice pleading standards to the takings context and does not establish a heightened requirement.  At this stage, a basic statement of the property interests at issue is enough state a claim. See In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs, 138 Fed. Cl. 658, 669 (2018) ("At the pleadings stage . . . , there is no need for a plaintiff to separately identify each type or item of personal property" alleged to have been taken by the Government.).

b. Plaintiffs' Specific Property Rights Alleged in the Complaint

The section 404 permit indirectly regulates mining by directly regulating mining-generated waste disposal operations.  The Government contends that Plaintiffs do not allege that they each individually hold interests in both the land to be mined and the hollows in which spoil will be filled.  This distinction is significant because "a claimant seeking compensation from the government for an alleged taking of private property must, at a minimum, assert that *its* property interest was actually taken by the government action."

---

[5] Defendant also argues that Plaintiffs' complaint should be dismissed because Plaintiffs cannot, as a matter of law, hold a compensable property interest in a Government-issued permit.  Plaintiffs "do not assert any property right in the permit itself."  Pl. Response at 8.  Accordingly, the Court will not engage in this analysis.

4

Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1216 (Fed. Cir. 2005). Allegations of a "derivative injury" stemming from governmental regulation of a third party's property, therefore, are insufficient to state a takings claim. Id. Accordingly, ownership of just the land to be mined but not of the disposal site is insufficient to state a claim.

The Plaintiffs do not hold identical interests. The Court will address the Defendant's allegations as they apply to each Plaintiff individually.

### i. Mingo's Property Interests

Plaintiffs allege that Mingo and United "entered into a 'Coal Lease Agreement . . . that covers the mining of the Spruce No. 1 area." Compl. ¶ 20. Thereafter, Mingo applied for, and the EPA issued, a section 404 permit to dispose of spoil in the hollows. Id. ¶ 42. The EPA rescinded the permit, thus allegedly depriving Mingo of the right to use its property as desired. Id. ¶ 71. The Government asserts that these allegations do not show any interest in the hollows where the spoil would be disposed.

The Court disagrees. In submitting its section 404 permit application, 33 C.F.R. § 325.1 required Mingo to affirm its ownership interest in the hollows. See § 325.1(d)(8) ("The signature of the applicant or the agent will be an affirmation that the applicant possesses or will possess the requisite property interest to undertake the activity proposed in the application . . . ."). When faced with a motion to dismiss, courts may consider such information outside the complaint, including "matters incorporated by reference or integral to the claim, items subject to judicial notice, and matters of public record." Dimare Fresh, Inc. v. United States, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (citations omitted). The permit and circumstances surrounding its withdrawal are integral to Plaintiffs' claims. Accordingly, the permit acts as an assertion of Mingo's property ownership over the hollows wherein spoil would be deposited. The allegations in the complaint, taken with Mingo's affirmation made in its application, are, therefore, enough to push Mingo over the pleading hurdle.

### ii. United's Property Interests

Plaintiffs allege that "United owns the land and most of the coal that can be mined in the area of West Virginia known as Spruce No. 1," and that "United is entitled to receive certain tonnage royalties" from Mingo pursuant to the lease agreement whereby United permitted Mingo to mine on United's land. Compl. ¶ 1, 22.

United owns the land to be mined and the rights to the underlying minerals. United has an interest in the hollows where spoil would be disposed to the extent that it holds a royalty fee arrangement from Mingo's mining operations. There are a variety of ways in which a plaintiff can hold a property interest cognizable under the Fifth Amendment. See

5

United States v. Gen. Motors Corp., 323 U.S. 373, 378 (1945) (the takings clause addresses "every sort of interest the citizen may possess."). Accordingly, United holds an interest in both the land to be mined and the spoil disposal site.

In sum, Plaintiffs have identified their ownership rights with enough specificity. United owns the property to be mined and the mineral rights to coal, as well as an interest in the hollows where spoil would be disposed of through its royalty fee arrangement with Mingo. Mingo leases the mining land and mineral rights from United and holds an interest in the disposal site. Accepting the allegations as true, Plaintiffs present facts "plausibly suggesting" property interests in these lands that are cognizable under the Fifth Amendment. Twombly, 550 U.S. at 557.

c. West Virginia Property Rights

The Constitution "neither creates nor defines the scope of property interests compensable under the Fifth Amendment." Maritrans, Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003) (citing Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)). Instead, courts look to "'existing rules and understandings' and 'background principles' derived from an independent source, such as state, federal, or common law" to define the requisite property interest to establish a taking. Id. (citing Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1030 (1992)). "[C]onfiscatory regulations . . . must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." Lucas, 505 U.S. at 1029. Accordingly, if "background principles of nuisance and property law [] prohibit the uses [a landowner] now intends in the circumstances in which the property is presently found," then governmental regulation of that use takes nothing from the owner. Id. at 1031–32.

i. The Pigeonroost and Oldhouse Streams

The Government asserts that even if the streams are on Plaintiffs' property, the State of West Virginia owns the underlying streambeds. See Def. Mot. at 15 n.3. Thus, Plaintiffs cannot dispose of spoil therein because the streambeds are not Plaintiffs' property. As evidence that these areas are streams with streambeds belonging to the State, the Government points to two sources: (1) the EPA's determination that these areas are "perennial" and "intermittent" streams, id. Ex. 1, and (2) a Southern District of West Virginia case granting adjacent landowners a preliminary injunction enjoining Mingo's predecessor in interest from disposing spoil into the Pigeonroost stream pending issuance of the appropriate permits. See Bragg v. Robertson, 54 F. Supp. 2d 635, 643 (S.D.W. Va. 1999). The court in Bragg found the Pigeonroost stream "to be of very good quality, with clear running water, and containing many of the beneficial aquatic life." Id.

Under West Virginia law, whether an area is a waterway subject to State control turns on a navigability test: "whether the stream, in its natural and ordinary condition,

affords a channel for useful commerce." Campbell Brown & Co. v. Elkins, 93 S.E.2d 248, 266 (W.Va 1956). If the Pigeonroost and Oldhouse streams do not meet this standard, then the State cannot claim ownership over them. While Bragg noted the quality of the stream, it is silent on this issue of navigability. Similarly, though the EPA designated these areas as intermittent or perennial streams, that finding says nothing as to their status as waterways under West Virginia law. Indeed, it appears that the EPA's framework could be considerably more inclusive than what is contemplated under West Virginia's navigability test. See Sackett v. EPA, 566 U.S. 120, 132 (2012) (Alito, J., concurring) ("Any piece of land that is wet at least part of the year is in danger of being classified by EPA employees as . . . covered by the [Clean Water Act].").

Plaintiffs may use their land for their own economic benefit, which includes for mining purposes. See Schooner Harbor Ventures, Inc. v. United States, 569 F.3d 1359, 1364 (Fed. Cir. 2009) ("The right to develop one's land is clearly cognizable."); Cienega Gardens v. United States, 331 F.3d 1319, 1336 (Fed. Cir. 2003) ("[T]he right to mine . . . [is] inherent in . . . ownership rights."). Plaintiffs claim that the permit revocation prevents them from mining, thus prohibiting them from using their land in an economically beneficial way. See, e.g., Compl. ¶ 64; see also Chicago, Rock Island & Pac. R.R. Co. v. United States, 284 U.S. 80, 96 (1931). While further factual development appears necessary on this point, Plaintiffs have pleaded enough at this stage.

ii.   Plaintiffs' Use of the Streams

In the alternative, the Government claims that even if Plaintiffs own the streambeds, Plaintiffs' spoil disposal would bury the streams, thus violating the reasonable use doctrine. See Def. Mot. at 9. That doctrine confines riparian landowners to use surface water only to the extent that it does not disturb the waterway's flow or impede the rights of downstream owners. See Morris Assocs., Inc. v. Priddy, 383 S.E.2d 770, 773 (W. Va. 1989) ("Generally, under the rule of reasonable use, the landowner, in dealing with surface water, is entitled to take only such steps as are reasonable, in light of all the circumstances of relative advantage to the actor and disadvantage to the adjoining landowners, as well as social utility.").

The Government's assertion is at odds with the allegations in the complaint. For example, Plaintiffs assert that an Environmental Impact Study taken of the area indicated that their anticipated project would "only contribute minimally to cumulative impacts on surface water quality," and that "a net gain of waters of the U.S. . . . would occur" in the area. Compl. ¶ 36. Plaintiffs have alleged enough. The impact to downstream owners requires further factual development.

2. Taking of Property

a. Count I

Plaintiffs declare that "[t]he EPA's revocation of the permit constituted a categorical taking under Kaiser Aetna v. United States, 444 U.S. 164 (1979)." Compl. ¶ 67. Plaintiffs' choice of language leads to some confusion.

"A categorical takings occurs when regulations compel the property owner to suffer a physical invasion of its property" or prohibit "all economically beneficial or productive use." Dimare Fresh, 808 F.3d at 1307 (citing Lucas, 505 U.S. at 1005). In the latter situation, "[i]f, however, a regulation prohibits less than all economically beneficial use of the land and causes at most a partial destruction of its value, the case does not come within the Supreme Court's 'categorical' taking rule." Fla. Rock Indus., Inc. v. United States, 18 F.3d 1560, 1565 (Fed. Cir. 1994). A "categorical taking" has, therefore, become a legally significant term invoking the set of extraordinary circumstances first laid out in Lucas.

Plaintiffs do not allege that either of those two circumstances exist here. Instead, they argue that Kaiser Aetna sets forth a "categorical rule" that when the Government authorizes a particular use for land and significant costs are incurred in reliance on that authorization, then the property owner acquires a right to use that property in the authorized manner. Compl. ¶¶ 67-68. The Government's refusal to allow the previously-authorized use constitutes a taking. Id. ¶ 71. At oral argument, Plaintiffs clarified that indeed their claim is not for a "categorical taking" as the term is defined, but rather is an attempt to draw from Kaiser Aetna a rule regarding the impact of reliance on Government representations and recovery on a takings claim. See Oral Arg. Tr. at 34:9-25 ("Your Honor, with respect to terminology . . . we described a categorical rule . . . . It's a categorical rule because essentially what Kaiser focuses on is that whatever the nature of the reliance interest engendered by the government action, that creates a property interest. And if the Government takes that away, that becomes the denominator. So if you spend $100 million in reliance on some government activity . . . you're entitled to that recovery . . . even if you have other value associated with the property elsewhere.").

In Kaiser Aetna, the plaintiff leased private land on which sat a privately-owned pond. Kaiser Aetna sought to develop the pond into a marina by dredging a lagoon to connect the pond to a neighboring bay. Before beginning construction, Kaiser Aetna sought the Government's input, and the Government acquiesced to the project. Kaiser Aetna then dredged the lagoon connecting the privately-owned pond to the bay, a navigable water of the United States (i.e. property of the United States). See 444 U.S. at 177-180. After Kaiser Aetna completed the project, the Government required Kaiser Aetna to open its marina to the public because the property "had become a navigable water of the United States." Id. at 168. The Government declared that it need not compensate Kaiser Aetna

because the Government acted pursuant to its authority to exercise a public right of navigation over interstate waters for which landowners need not be paid.

The Supreme Court found that the Government could not require Kaiser Aetna to allow public access "without invoking its eminent domain power and paying just compensation." Id. at 180.  The court's result turned primarily on three facts: (1) Kaiser Aetna made its large investment with the Government's consent, (2) Kaiser Aetna had made significant progress in its development project, and (3) the Government's proposed course of conduct would infringe on a "fundamental element" of Kaiser Aetna's property rights (there, its right to exclude).  See id. at 179-81.

That case does not add to the list of limited and extraordinary situations wherein the Government's actions amount to a "categorical taking" as the term is defined in Lucas.  Accordingly, since Plaintiffs have not alleged facts that they have suffered a physical invasion of their property or that their property has been deprived of all economically beneficial or productive use, they have not stated a categorical takings claim.

However, the Court reads Kaiser Aetna as an application of the now familiar factors used to determine whether a plaintiff's economic injuries constitute a regulatory taking as first outlined in Penn Cent. Transp. Co. v. City of N.Y., 438 U.S. 104, 124 (1978) (discussed below).  See id. at 175-76 (citing the "Penn Central" factors as guiding the court's analysis).  Plaintiffs are welcome to rely on Kaiser Aetna to the extent that it informs the Court's analysis of whether a regulatory taking has occurred.  Plaintiffs, therefore, can test their legal theory based on Kaiser Aetna as laid out in Count I of their complaint under Count II.

### b. Count II

"[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."  Penn. Coal Co. v. Mahon, 260 U.S. 393, 415 (1922). There is no "set formula" for this analysis.  Dimare Fresh, 808 F.3d at 1307 (citing Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 224 (1986)).  Instead, courts conduct a fact-based inquiry, which considers: (1) the character of the governmental action; (2) the economic impact of the action on the claimant; and (3) the effects of the governmental action on the reasonable investment-backed expectations of the claimants. See Penn Cent., 438 U.S. at 124; see also Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 538-39 (2005).  The Federal Circuit has recognized "that the denial of a section 404 permit could amount to a taking of a cognizable property right as it deprives the landowner of a right inherent in the land ownership . . . ."  Hearts Bluff Game Ranch, Inc. v. United States, 669 F.3d 1326, 1330 (Fed. Cir. 2012).

After the EPA issued the section 404 permit to Mingo, Mingo allegedly invested millions of dollars in developing its property to carry out operations that the permit

9

specifically authorized.  Compl. ¶ 75.  The EPA then withdrew the permit, a decision which, according to Plaintiffs, was unprecedented and thus unforeseeable.  Id. ¶ 76.  Plaintiffs assert that the result was to foreclose them from using their land for coal mining operations and the deprivation "of tens of millions of dollars in economically beneficial or productive use or value of the property."  Id. ¶ 74.  The complaint therefore contains allegations that the section 404 permit withdrawal deprived Plaintiffs from using their property for coal mining.  Plaintiffs have pleaded enough to state a regulatory takings claim under the Penn Central framework.[6]

### Conclusion

In conclusion, the Government's Motion to Dismiss for failure to state a claim pursuant to Rule 12(b)(6) is GRANTED as to both Plaintiffs on Count I and DENIED as to both Plaintiffs on Count II.  No costs.

The Court orders the parties to file a Joint Status Report within 30 days of the date of this Opinion and Order proposing how they intend to proceed.

IT IS SO ORDERED.

s/ Thomas C. Wheeler<br>
THOMAS C. WHEELER<br>
Judge

---

[6] The D.C. Circuit's determination that the EPA's permit revocation did not run afoul of the APA does not necessarily mean that their action did not result in a compensable taking.  Simply because the Government had the authority to act does not mean that its action cannot go too far and violate Plaintiffs' Fifth Amendment rights.