# In the United States Court of Federal Claims

No. 17-67 L
Filed: February 28, 2023

|  |  |
|---|---|
| UNITED AFFILIATES CORPORATION and MINGO LOGAN COAL LLC, | ) ) ) ) |
| *Plaintiffs*, | ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) |
| *Defendant*. | ) ) |

*Kevin P. Holewinski*, Jones Day, Washington, D.C., for Plaintiff United Affiliates Corporation. *Daniella A. Einik*, of counsel.

*Robert M. Rolfe*, Hunton Andrews Kurth LLP, Richmond, VA, for Plaintiff Mingo Logan Coal LLC.  *George P. Sibley, III*, of counsel.

*Joshua P. Wilson*, U.S. Department of Justice, Environment and Natural Resources Division, Natural Resources Section, Washington, D.C., with whom were *Todd Kim*, Assistant Attorney General, *Hannah O'Keefe* and *Erika Norman*, of counsel, for the Defendant.

**OPINION AND ORDER**

The Government moves for evidentiary sanctions because Mingo Logan failed to preserve documents that it deleted approximately four months after filing this action.  The Government seeks to preclude Plaintiffs from relying on documents that Mingo Logan failed to preserve or from using documents derived from those lost documents, and for fees and costs associated with additional discovery that Mingo Logan's failure to preserve has generated.  Mingo Logan admits that it did not take appropriate steps to preserve the lost data but opposes sanctions.  Because Mingo Logan failed to preserve relevant documents despite a clear duty to do so, the Court grants-in-part the Government's motion insofar as it seeks to preclude Plaintiffs from relying on documents Mingo Logan failed to preserve.  And the Court grants the Government's motion insofar as it seeks fees and costs from Mingo Logan associated with the discovery depositions discussed herein and for added work its experts must undertake to reconstruct lost data.  The Court will defer until summary judgment or trial whether documents derived from lost documents may be used.

I.  **Background**[1]

Following an approximately ten-year application process and an extensive environmental impact study, the Government granted Mingo Logan a permit in 2007 pursuant to Section 404 of the Clean Water Act that allowed Plaintiffs to discharge spoil material generated by surface mining operations at a site in West Virginia known as the Spruce No. 1 mine into two nearby streams. ECF No. 39-1 at AR025384-AR025403. In 2011, however, the Environmental Protection Agency exercised its authority under Section 404 to withdraw the permit insofar as it allowed the discharge of fill material into the two streams. ECF No. 60-2 at AR010201. This litigation followed.

During discovery, the Government sought to obtain Mingo Logan's mine models and forecasts. The Government first requested the modeling and underlying data that supported the 2007 permit:

> [A]ll modeling input data used to create the model used to support your application for Permit # S-5013-97 for Spruce No.1 Mine, including but not limited to: (1) the 3D Model used at the time of IBR #2 submittal for tonnage calculations with historical documentation, including descriptions of Carlson grids and layers; (2) drillhole information used to create the geologic model; and (3) coal quality information, including wash analysis.

ECF No. 119-6 at 6 (RFP No. 2).[2] Mingo Logan produced the modeling files that it created in 2006. The Government also sought any updated modeling input data:

> [A]ll modeling input data used to create the most recent version of the model you have used to make projections for the Spruce No. 1 Mine, including but not limited to: (1) the 3D Model used for tonnage calculations with historical documentation, including descriptions of Carlson[3] grids and layers; (2) drillhole information

---

[1] Because the facts of this matter are presented at length in the Court's prior decisions, *see* 143 Fed. Cl. 257 (2019), 147 Fed. Cl. 412 (2020), & 154 Fed. Cl. 335 (2021), the background included here is that relevant to the resolution of the pending motion.

[2] Because this exhibit is not consecutively numbered, the Court cites to the ECF header when citing ECF No. 119-6.

[3] "Carlson" refers to the software that Mingo Logan used to generate mine models that coal reserve estimates and other projections. For Spruce No. 1, geologists drilled into the ground and collected core samples of what was under the ground. They loaded these data into a geologic model—software MINEX—that overlayed the surface with 50' x 50' squares and estimated the distribution of coal under those squares. They then loaded these data into Carlson's SurvCADD software, which allowed the onsite engineers "to calculate production advance rates, overburden yardage, tonnage production, and product quality." ECF No. 128 at 5-6. The Carlson software creates .GRD files containing its output data. *Id.*

> used to create the geologic model; and (3) coal quality information, including wash analysis.

ECF No. 119-6 at 6 (RFP No. 2).  The Government believed updated models existed because Mingo Logan had conducted mining operations in the vicinity of Spruce No. 1 after the § 404 permit issuance in 2008, which included contract mining by Eagle Creek Mining in an area near one of the streams covered by the § 404 permit.  ECF No. 119 at 8.  Mingo Logan did not produce any updated modeling files.  The present dispute arose when the Government pressed for modelling files created or updated after 2006.

There was an extended back-and-forth between the Government and Mingo Logan regarding what modelling files were generated and produced.  The Court held a series of discovery conferences in July and August 2021 regarding the ongoing discovery issues.  ECF Nos. 108 & 113.  During the August conference, the Government recounted its efforts to obtain the modelling files and its frustration at not getting the answers it wanted.  ECF No. 113 at 31:4-32:10.  At that point, the Court suggested that if the parties' efforts were not yielding the information that the Government wanted, the Government may be best served by taking a RCFC 30(b)(6) deposition of Mingo Logan to get the information about what mine model data it had.  *Id*. at 32:11-23.  The Government then noticed a RCFC 30(b)(6) deposition and the Government designated Mr. McDaniel, a lead engineer for Mingo Logan, as the 30(b)(6) witness for the deposition scheduled for December 8, 2021.  *See* ECF No. 119-2 at 1.

On December 6, 2021, just two days before the 30(b)(6) deposition, Mingo Logan informed the Government that certain Carlson .GRD files appeared to have been lost.  *See* ECF No. 119-1.  As Mingo Logan explained, when it filed this action, it did not place a litigation hold on the files of Mr. Frank Robinette, the Mingo Logan engineer with primary responsibility for mine planning and modeling at Spruce No. 1.  When Mr. Robinette left Mingo Logan four months after Plaintiffs commenced litigation, nothing was done to preserve his computer or email because there was no litigation hold in place covering him.  ECF No. 119-1 at 1; *see also* ECF No. 128 at 10.  As Mingo Logan acknowledged to the Government, "[c]ertain .GRD modelling files appear to have been stored only on Mr. Robinette's hard drive."  ECF No. 119-1 at 2.  But Mingo Logan contended that any information from these files could be gleaned from other documents that Mingo Logan had preserved and produced.

The Government then deposed Mr. McDaniel, Mingo Logan's 30(b)(6) designee, who confirmed that Mingo Logan could not find the most current Carlson model of Spruce No. 1, which Mingo Logan admitted it had created.  ECF No. 119-2 at 109:4-110:4.  The Government also deposed Mr. Robinette, who confirmed that his files had included:

> 1. "[A] dozen or more" binders "that included drill holes" and "available coal reserves at Spruce,"
>
> 2. Analysis of "alternatives to using" the "valley fills that were at Pigeonroost and Oldhouse that were originally part of the Section 404 permit for Spruce" and for "the Seng Camp Creek valley fill" based on "the most current version of the grid files,"

>   3. "[R]eserve reports generated from the 3-D grid files" that "were in the binders" and likely also "saved on [Robinette's] computer,"
>
>   4. An "Outlook folder" with "a bunch of folders" including one "for the Spruce No. 1 Mine" which itself had "subfolders" that "could have been for various individuals like Mr. McDaniel" or "for specific tasks,"
>
>   5. A "computer with a hard drive" that contained "folders" including one "for the Spruce Mine" with "subfolders" including "project folders" that contained "spreadsheets . . . Life-of-Mine plans and things like that" including "analysis of alternatives to using Pigeonroost and Oldhouse."

ECF No. 119-3 at 11:1-4, 11:23-12:1, 71:15-72:23, 76:3-13, 100:2-13, 105:11-106:1, 106:2-16, 109:6-111:4, 116:6-24.

During Mr. Robinette's deposition, the Government also explored his work analyzing alternatives to the discharge of spoil into the Pigeonroost and Oldhouse Branch streams. In 2010, the Government provided a report by Mr. John Morgan, a mining engineer with Morgan Worldwide, that outlined what Mr. Morgan believed were viable alternatives to Pigeonroost and Oldhouse Branch spoil discharges. *See* ECF No. 128-7. Although Mr. Robinette did not recall the Morgan Report specifically, ECF No. 119-3 at 77:23-78:3, he testified that he did perform analyses of alternatives to Pigeonroost and Oldhouse Branch, *id.* at 71:15-21. His analyses were "probably" saved in folders called "2 valley fill option, 3 valley fill option, 4, under the Spruce directory" on his computer. *Id.* at 110:15-24. These files too were lost when Mingo Logan failed to preserve his computer.

Finally, Mr. Robinette testified that he maintained hard copy files, external drives, and CDs with data in his office. ECF No. 119-3 at 113:8-17. None of these materials have been produced and it appears that they are lost as well. ECF No. 132 at 9:1-8.

## II.   Legal Standard

A party has "a duty to preserve evidence when litigation is 'pending or reasonably foreseeable.'" *4DD Holdings, LLC v. United States*, 143 Fed. Cl. 118, 130 (2019) (quoting *Micron Tech., Inc. v. Rambus, Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011)). Because litigation was pending at the relevant time here—Mingo Logan failed to preserve Mr. Robinette's files when he left Mingo Logan four months after it filed the complaint—the Court need not wade into when litigation was "reasonably foreseeable." Parties who lose relevant evidence they were under a duty to preserve for pending litigation by failing to take reasonable steps to protect it commit spoliation. *See id.* at 130-34. "The court may impose sanctions for spoliation based on the court's inherent authority to govern the judicial process and pursuant to Rule 37 of the Rules of the United States Court of Federal Claims." *Id.* at 130. "In either instance, the policies underlying the sanctions are multifaceted: to punish the spoliator, so as to ensure that it does not benefit from its misdeeds; to deter future misconduct; to remedy, or at least minimize, the evidentiary or financial damages caused by the spoliation; and last, but not least, to preserve the

4

integrity of the judicial process and its truth-seeking function." *United Med. Supply Co. v. United States*, 77 Fed. Cl. 257, 264 (2007).

Spoliation sanctions range from adverse inferences to attorney's fees to, in the most severe instances, dismissal of the case. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991) ("[O]utright dismissal of a lawsuit . . . is a particularly severe sanction, yet is within the court's discretion. Consequently, the 'less severe sanction' of an assessment of attorney's fees is undoubtedly within a court's inherent power as well.") (citation omitted); *United Med. Supply Co.*, 77 Fed. Cl. at 263 ("Spoliation may result in a variety of sanctions, with 'the oldest and most venerable remedy' being an 'adverse inference,' under which the finder of fact may infer that the destroyed evidence would have been favorable to the opposing side.") (quoting Jonathan Judge, "Reconsidering Spoliation: Common-Sense Alternatives to the Spoliation Tort," 2001 Wis. L. Rev. 441, 444 (2001)) (additional citations omitted). No rule requires the Court to impose specific sanctions in particular circumstances; rather, the Court itself responsibly exercises "restraint and discretion" and "common sense" to choose appropriate and effective sanctions for the circumstances it encounters. *Chambers*, 501 U.S. at 44-45 ("Because of their very potency, inherent powers must be exercised with restraint and discretion. A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process.") (citation omitted); *Chapman Law Firm, LPA v. United States*, 113 Fed. Cl. 555, 611 (2013) ("When deciding whether to impose sanctions based on spoliation in a particular case, . . . the discretion of the court must be exercised in a common sense manner, individually, with respect to the facts of each case."). The Court will not impose severe spoliation sanctions unless a party intentionally spoliated evidence. *See United Med. Supply Co.*, 77 Fed. Cl. at 270 ("When considering the most powerful of the available sanctions, particularly those that might lead to a determination other than on the merits, the court must use an additional measure of restraint, which ordinarily requires that the offending party's conduct evinces serious fault, willfulness or bad faith.").

RCFC 37(e) guides the Court when imposing sanctions for spoliation of electronically stored information ("ESI"). *4DD Holdings, LLC*, 143 Fed. Cl. at 130 ("When the evidence at issue is electronically stored information, Rule 37(e) sets out the framework for imposing sanctions."). RCFC 37(e) provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court: (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may: (A) presume that the lost information was unfavorable to the party; (B) [not used]; or (C) dismiss the action or enter a default judgment.

**III.    Discussion**

5

The Government focuses on two primary groups of evidence that it claims Mingo Logan spoliated. First, the Government alleges that Mingo Logan destroyed updated versions of the Carlson Model that Mr. Robinette generated after 2006. Second, the Government alleges that Mingo Logan destroyed all of the analyses of alternatives to using the Pigeonroost and Oldhouse Branch streams for spoil discharge sites. The Court addresses them in turn.

**A.     Carlson Mine Model**

The Government "moves under RCFC 37(e)(1) and this Court's inherent authority" that this Court preclude Plaintiffs from introducing mining projections "derived from the destroyed Carlson mine model." ECF No. 119 at 1, 23. In order to preclude this evidence, the Court must first determine whether it was spoliated.

1.     The Carlson mine model .GRD files are lost

The Carlson mine model consists of .GRD files made at specific points in time. The Government alleges that Plaintiffs never produced Carlson mine model .GRD files created after 2006, and claims that such files existed. *See* ECF No. 119 at 17 ("[T]he company deleted all of the Spruce-related folders on [Mr. Robinette's] hard drive, including unique modeling files that post-date 2008 that have not been identified elsewhere in Plaintiffs' productions from other custodians."). Mingo Logan, however, contends that "there is no evidence that any such files exist." ECF No. 128 at 15. Not so. Mr. Robinette testified that he created multiple updates to the Carlson model. ECF No. 119-3 at 24:11-21, 39:17-40:11. While Mr. Robinette did not remember the specific times that he updated the model, he testified that "it was after we started mining with the contractor." *Id.* at 24:19-20. And the record is not entirely clear, but it appears that the contract mining has taken between 2007 and 2016. *See* ECF No. 119 at 19 & n.1. Suffice it to say, Mr. Robinette was clear that he updated the model after the 2006 models that Mingo Logan produced. And not only did he testify to having created the updated Carlson models, he explained the folder structure on his former computer and identified precisely where the files had been stored. ECF No. 119-3 at 106:2-108:1. The Court cannot discount his detailed testimony about what he created and where he stored it on his computer that Mingo Logan failed to preserve. And Mingo Logan's 30(b)(6) designee also indicated that there were subsequent updates to the Carlson model. He testified that "I do not believe that there were any subsequent changes to the Carlson model, the base Carlson model, *subsequent to the 2008 time frame slash era*." ECF No. 130-2 at 32:7-9 (emphasis added). Mingo Logan's counsel all but admit this as well. ECF No. 119-1 at 1 ("The majority of Mr. Robinette's work as it relates to the surface mineable reserves at the Spruce mine that are the basis of Mingo Logan's takings claim took place between 2000 *and 2008*.") (emphasis added).

This Court finds that the Carlson mine model .GRD files created after 2006 are lost.

2.     The lost .GRD files are relevant

The Government alleges that the lost .GRD files are relevant to prongs one ("economic impact") and two ("distinct investment backed expectations") of the *Penn Central* test, as well as to determining just compensation. *See* ECF No. 119 at 10; *Resource Invs., Inc. v. United States*, 85 Fed. Cl. 447, 474 (2009) (weighing "(1) the 'economic impact of the regulation on the

6

claimant;' (2) 'the extent to which the regulation has interfered with distinct investment backed expectations;' and (3) 'the character of the governmental action.'"). Plaintiffs respond that the lost .GRD files are not relevant to the first prong because "[P]ost-2006 .GRD files are not necessary for determining the economic impact of the Government's take on the value of Plaintiffs' property." ECF No. 128 at 18.

During the parties' discussions, Mingo Logan asserted that "[t]he majority of Mr. Robinette's work as it relates to the surface mineable reserves at the Spruce mine that are the basis of Mingo Logan's takings claim took place between 2000 and 2008. This included the development of volume projections through the manipulation in SurvCADD of raw drill hole data from Ark Land, as well as the creation of planning and sequencing spreadsheets." ECF No. 119-1 at 1.[4] This may be so, but that does not make the post-2006 updates to the model irrelevant. The alleged taking in this case took place in 2011, not 2006. And Mr. McDaniel testified that the Carlson model that Mingo Logan used for mine planning and to project coal reserves was a 2008-era model. ECF No. 119-2 at 53:7-13.

And a key issue in this case will be the value of the property when it was allegedly taken in 2011. The lost .GRD files are clearly relevant when determining the economic impact of the Government's alleged taking. To determine economic impact, this Court must consider how the permit revocation affected the fair market value of Mingo Logan's property. *Lemon Bay Cove, LLC v. United States*, 147 Fed. Cl. 528, 534 (2020) ("The second factor, the economic impact of the regulation on the claimant, is 'measured by the change, if any, in the fair market value caused by the regulatory imposition.'") (quoting *Florida Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1567 (Fed. Cir. 1994)). The property's fair market value is almost certainly influenced by "production advance rates, overburden yardage, tonnage production, and product quality," which Plaintiffs admit they calculated using the Carlson mine model .GRD files. *See* ECF No. 128 at 6. To the extent these models changed between 2006 and 2011, those changes are clearly important to this case. And the .GRD files would help this Court understand the property's fair market value and help it determine just compensation (should the Court find the Government liable for a taking). Therefore, the Court finds that the lost .GRD files are relevant.

### 3. Mingo Logan had a duty to preserve the lost .GRD files and did not take reasonable steps to do so

According to the Government, "Mingo Logan held and breached a duty to take reasonable steps to preserve Mr. Robinette's Spruce-related ESI and hard copy documents, including his mine modeling files . . . ." ECF No. 119 at 16. Indeed, Mingo Logan concedes that it failed to take reasonable steps to preserve the .GRD files: "Your Honor, we don't contest -- we don't contest that the first element here that reasonable steps were taken to preserve this material. I think as people who are experienced in litigation, we would recognize certain steps that -- additional steps that should have been taken." ECF No. 132 at 37:13-18.

Mingo Logan reasonably instructed its employees about data preservation but did not take the necessary step of sufficiently following-up with these instructions or ensuring that employee computers were preserved when they left the company. Thus, Mr. Robinette's files

---

[4] Ark Land is an affiliate of Mingo Logan.

were not subject to any litigation hold when he left the company four months after Mingo Logan filed this lawsuit. *See* ECF No. 119-1 at 1 ("Mr. Robinette was not placed on a legal hold when this case was filed in January 2017."). Because Mr. Robinette's files were not put on the litigation hold, they were subject to Mingo Logan's standard operating procedures, which meant that any information Mr. Robinette stored locally on his computer but not on remote servers would be destroyed. ECF No. 128 at 10 ("Mingo Logan did not put measures in place to preserve data he had stored locally" prior to "recycl[ing] his workstation and restor[ing] it to factory settings, per the company's standard operating procedures."). And because Mr. Robinette stored many files locally that were not transferred to remote servers, Mingo Logan destroyed many of his files when he left the company. *Id.* ("One Mingo Logan employee, Frank Robinette, abided the instruction to save his Spruce files, but he did not transfer his Spruce-related files to the server. . . . [A]ny data stored only on Mr. Robinette's local drive was lost."). Mr. Robinette did not transfer his file folder of .GRD files to the server "because of the sheer size of it." ECF No. 119-3 at 38:24-39:3.

This Court agrees that Mingo Logan had a duty to preserve the lost .GRD files and did not take reasonable steps to preserve them.

### 4. Mingo Logan spoliated the lost .GRD files

Parties must take reasonable steps to preserve relevant ESI in the anticipation or conduct of litigation. RCFC 37(e). Mingo Logan did not do so, and because of this ESI was lost. The Court finds that Mingo Logan spoliated the Carlson mine model .GRD files created after 2006.

### B. 2010 Morgan Report Analyses

The Government "moves under RCFC 37(e)(1) and this Court's inherent authority" that this Court preclude Mingo Logan from "introducing evidence or offering testimony regarding the company's alleged contemporaneous analysis of the mining alternatives to using the Pigeonroost and Oldhouse Branch streams as disposal sites, including alternatives that EPA presented to Plaintiffs in the 2010 Morgan Report." ECF No. 119 at 1, 23. In order to preclude this evidence, the Court must first determine whether it was spoliated.

### 1. The 2010 Morgan Report analyses are lost

In 2010, the EPA presented Mingo Logan with the Morgan Report, which documented alternatives for excess spoil disposal at the Spruce Mine that did not include discharges into the Pigeonroost and Oldhouse Branch streams. Mingo Logan's RCFC 30(b)(6) designee, Mr. McDaniel, confirmed that Mingo Logan had performed various analyses on the alternatives presented in the Morgan Report. *E.g.*, ECF No. 119-2 at 128:2-17. And Mr. Robinette also testified that he performed certain analyses of alternatives as well, although he did not specifically remember the Morgan Report. ECF No. 119-3 at 71:15-21, 77:23-78:3. It is undisputed that the analyses that Mr. Robinette performed have been lost because he stored them on "a computer with a hard drive" where the "majority of [his] work was saved." *Id.* at 106:2-7, 110:15-24. The problem, as the Government sees it, is that Mingo Logan analyzed the 2010 Morgan Report and/or other alternatives to the Pigeonroost and Oldhouse Branch streams but has not produced any of these analyses in discovery. ECF No. 119 at 21.

8

The Plaintiffs, however, have cast doubt on whether Mingo Logan actually performed any analyses of the Morgan Report at all. In its opposition, Mingo Logan responds that the Government never received these analyses because Mingo Logan never analyzed the Report. Thus, Mingo Logan asserts that "the Government *assumes* that Mingo Logan must have lost its analysis of the Morgan alternatives because the company has not produced such analysis and lost *other* files on Robinette's hard drive." ECF No 128 at 21 (citation omitted). And during oral argument, Mingo Logan again sought to distance itself from the Morgan Report, arguing that "These are not serious alternatives. . . . I mean, some of these alternatives just don't pass the smell test at all. Like they don't require deep analysis." ECF No. 132 at 46:8-47:9.

The problem with Plaintiffs' argument is that it explicitly contradicts the sworn deposition testimony of Mingo Logan's own 30(b)(6) designee, Mr. McDaniel. When asked, he testified that Mingo Logan did analyze the alternatives in the Morgan Report. ECF No. 130-2 at 128:14-17 ("Q. Did the company perform any work at all to analyze the proposals, the alternatives rather that are proposed in the Morgan Worldwide report? A. Yes, sir, the company did."). That's not all. Mr. McDaniel's testimony also contradicts Mingo Logan's contention that the Morgan Report's proposed alternatives were "not serious" and "[didn't] require deep analysis." Here, too, the Government asked how much time Mingo Logan spent analyzing the Morgan Report's alternatives, and Mr. McDaniel testified that Mingo Logan "didn't take John's [Morgan] alternatives and simply blow them off." ECF No. 119-2 at 131:9-16. Rather, Mingo Logan spent "[c]onsiderably more than a week" analyzing the alternatives in the Morgan Report. *Id.* Mr. McDaniel also characterized Mingo Logan's analyses of the Morgan Report as "significant" and "[r]ather intense." ECF No. 119-2 at 131:19-20. This work included modeling incremental costs for hauling spoil or overburden to alternate sites, including the number of trucks that would have been needed and their projected productivity. ECF No. 119-2 at 128:23-131-2. It defies common sense to believe that such "significant" and "rather intense" analyses and calculations were not documented in some fashion. Indeed, Mr. McDaniel testified that he was able to locate "one spreadsheet that summarizes a delta between the -- between the haulage fleet," but was unable to find the data or analyses that went into the spreadsheet. ECF No. 119-2 at 131:21-132:18.

Given the choice between sworn witness testimony and litigation arguments, the Court relies on the witness testimony and concludes that the Government has sufficiently shown that Mingo Logan analyzed the alternatives in the Morgan Report and lost these analyses.

    2.    <u>The lost analyses are relevant</u>

The Government alleges that the Morgan Report analyses are relevant to prongs one ("economic impact") and two ("distinct investment backed expectations") of the *Penn Central* test, as well as to understanding Plaintiffs' mining operations. *See* ECF No. 119 at 22; *Resource Invs., Inc.*, 85 Fed. Cl. at 474 (weighing "(1) the 'economic impact of the regulation on the claimant;' (2) 'the extent to which the regulation has interfered with distinct investment backed expectations;' and (3) 'the character of the governmental action.'"). Plaintiffs respond that the report is not relevant to the second prong. *See* ECF No. 128 at 20 ("[T]he Morgan Report has no bearing on the company's investment-backed expectations during the relevant time period under *Penn Central*.").

9

The Morgan Report and Mingo Logan's analyses of it (or other alternative options) are clearly relevant when determining the economic impact of the Government's permit revocation. Mingo Logan does not deny that the Morgan Report contains "mining alternatives to using the Pigeonroost and Oldhouse Branch streams as disposal sites." ECF No. 128 at 19-23. Any analyses that Mingo Logan conducted of these alternatives could explain the extent that Mingo Logan could have mitigated the Government's permit revocation.

This Court finds that Mingo Logan's 2010 Morgan Report analyses are relevant.

### 3. Mingo Logan had a duty to preserve the lost analyses

As with the .GRD files, Mingo Logan does not contest that it had a duty to preserve the lost analyses and failed to take reasonable steps to preserve them.

As explained above, Mr. Robinette and Mr. McDaniel both testified to work they performed analyzing alternatives to the Pigeonroost and Oldhouse Branch discharges. Yet, Mingo Logan has not been able to locate any such analyses other than a single spreadsheet that summarizes some of its analysis, but none of the data or analyses underlying that single spreadsheet. As explained above, Mingo Logan did nothing to preserve Mr. Robinette's files, including his analyses of alternative options. While it is not clear what happened to any other analyses that Mr. McDaniel identified other than the single spreadsheet, it appears clear at this point any such analyses have been lost.

Thus, the Court finds that Mingo Logan had a duty to preserve its analyses of the Morgan Report and did not take reasonable steps to preserve it.

### 4. Mingo Logan spoliated the lost analyses

Parties must take reasonable steps to preserve relevant ESI in the anticipation or conduct of litigation. RCFC 37(e). Mingo Logan did not do so, and because of this ESI was lost. The Court finds that Mingo Logan spoliated its 2010 Morgan Report analyses.

**C.     The Court Should Impose Sanctions**

### 1. Mingo Logan's spoliation prejudices the Government

The Government moves this Court "for the imposition of sanctions against Plaintiffs for spoliation of evidence." ECF No. 119 at 1. Because the Court determined that Mingo Logan spoliated the Carlson mine model .GRD files created after 2006 as well as its analyses of the Morgan Report, the Court must turn to what sanctions are appropriate. Here, the Government seeks "proportionate sanctions," specifically that this Court:

> 1. Preclude Plaintiffs from introducing mining projections derived from the destroyed Carlson mine model, including calculations of overburden and coal reserves at the Spruce Mine and spreadsheets containing the output from the Carlson model, into evidence at trial or on summary judgment;

10

      2. Preserve the Government's experts' modeled calculations of overburden and coal reserves at the Spruce Mine from cross-examination or rebuttal at trial on the basis that they are inconsistent with Plaintiffs' Carlson model-based calculations; and

      3. Preclude Mingo Logan from introducing evidence or offering testimony regarding its alleged contemporaneous analysis of the mining alternatives to using the Pigeonroost and Oldhouse Branch streams as disposal sites, including alternatives that EPA presented to Plaintiffs in the 2010 Morgan Report.

ECF No. 119 at 23.  In response to Mingo Logan's protestations about the breadth of the proposed sanctions, the Government clarified at oral argument that its request for sanctions is "limited to the destruction of Mr. Robinette's files." ECF No. 132 at 7:25-8:1.  The Government explained that this includes barring Plaintiffs from "using any mining projections" lost in the destruction of Robinette's files, including but not limited to, "spreadsheets," "financial reporting statements," and "any mining projection for which the underlying modeling files were lost or destroyed," such as the 2008 ArcLand model to the extent it relies on destroyed information. *Id.* at 23:4-9, 42:24-43:13.  In other words, the Government is seeking to preclude Plaintiffs from using data that Mingo Logan failed to preserve for this litigation and documents derived from that data.

      The Government also requests fees and costs, including:

      1. Travel and court reporter expenses related to the depositions of Mr. McDaniel and Mr. Robinette;

      2. Additional expert witness hours expended by Mr. Morgan and his colleagues assisting the Government with those depositions and this motion;

      3. Reimbursement for time the Government's experts spent reconstructing Mingo Logan's mine model without the benefit of Mr. Robinette's files;

      4. Attorney's fees for time the Government's lawyers spent on efforts to locate Mingo Logan's modeling files prior to Mingo Logan's disclosure that it had destroyed Mr. Robinette's hard drive containing the .GRD files,

      5. Attorney's fees for time spent preparing for and taking Mr. McDaniel's and Mr. Robinette's depositions; and

      6. Attorney's fees for time spent preparing the sanctions motion.

ECF No. 119 at 24-25.

To determine the appropriate sanction, the Court must turn to whether the Government is prejudiced by the spoliation and, if so, how much. The Court will assess the lost Carlson model files and then the lost analyses of the Morgan Report.

### a)    *Carlson Mine Model*

The Government contends that the loss of the Carlson mine model .GRD files will prejudice it because: 1) the Government cannot obtain the information in other ways as "it is impossible to verify the accuracy of Mingo Logan's reserve calculations or other figures contained in the spreadsheets without the source data—the .GRD files," ECF No. 119 at 19-21; 2) the information is necessary to determine the economic impact of the Government's alleged taking as the model runs "could reveal, for example, that an area is not economically minable because the overburden is too great relative to the predicted coal tonnage," *id.* at 19; and 3) the loss of the information puts the Plaintiffs at an advantage by making the Government "unable to effectively challenge assertions made by Mingo Logan witnesses at trial concerning the alleged outputs of the model," *id.* at 18-19. Plaintiffs respond that loss of the Carlson mine model .GRD files created after 2006 will only minimally prejudice the Government because "much of" the information is available in the "produced modeling files for the 2006 Mine Model" and "spreadsheets reflecting the relevant data extracted from the Carlson .GRD files." ECF No. 128 at 14-17. Plaintiffs next propose that the lost files are not necessary to determine the economic impact of the Government's alleged taking. *Id.* at 18-19.[5] Finally, Plaintiffs propose that even if the lost files were relevant to determining economic impact, the Government is not harmed because it would be on equal footing with Plaintiffs who also do not have the information. *Id.* at 19. The Court addresses these arguments in turn.

First, Plaintiffs assert that they do not need to produce the .GRD files created after 2006 because they produced .GRD files and output spreadsheets for the 2006 Carlson mine model and output spreadsheets created after 2006 that the Government can use to reverse engineer and recreate the .GRD files created after 2006. ECF No. 128 at 15-17. As an initial matter, there is no discovery exception for documents the other side may be able to reverse engineer. And it is not entirely clear that the 2006 .GRD files and output spreadsheets necessarily represent the data in the .GRD files created after 2006. According to the Government, "the collection of spreadsheets to which Mingo Logan refers is not an adequate substitute for the deleted .GRD files for a number of reasons, including that they contain broken links, reflect no visualized spatial data, lack critical information about the source files used to generate them, and because Mingo Logan destroyed other spreadsheets that were stored on Mr. Robinette's hard drive." ECF No. 130 at 6. And Mr. Robinette testified that it may not be feasible to relate specific outputs to revisions in the mine model, undermining the ability to reverse engineer the model. The Government also should not be in a position where its experts reverse engineer the 2008

---

[5] Plaintiffs split up this analysis into two different sections, but the Court analyzes them as one. *See* ECF No. 128 at 18 ¶ 1 ("First, post-2006 .GRD files are not necessary for determining the economic impact of the Government's take on the value of Plaintiffs' property."); ECF No. 128 at 19 ¶ 2 ("Finally, the Government's own work to support its 2011 veto decision shows that information developed after 2006 is not necessary to analyze Plaintiffs' assessment of economic impact.").

.GRD files based on assumptions that they must make because the contemporaneous documents have been destroyed, only to have the Plaintiffs come back and propose that the Government's reverse engineered model is wrong based on what was in Mingo Logan's contemporaneous files. And because Mingo Logan's spoliation of the 2008 Carlson model is the only reason the Government's experts must reverse engineer the 2008 Carlson model, it certainly is appropriate to compensate the Government for this otherwise unnecessary time and expense. RCFC 37(e)(1); *4DD Holdings, LLC*, 143 Fed. Cl. at 130.

Second, Plaintiffs propose that the .GRD files are not necessary to determine the economic impact of the Government's taking because "[t]he 2006 Mine Model represents Mingo Logan's most comprehensive and well-vetted analysis of mineable reserves at Spruce before the Government's unprecedented section-404(c) action" and "Plaintiffs' economic impact/damages expert will rely on reserve amounts from the 2006 Mine Model." ECF No. 128 at 18. If Plaintiffs do not intend to rely on any modeling information created after 2006, the Court is confused why they would oppose a sanction preventing them from doing so. The most significant problem with Plaintiffs' argument is that their choice to rely on a 2006 model to calculate their alleged damages simply does not dictate how the Government (or the Court) must evaluate potential damages in this case. Multiple witnesses testified that Mingo Logan updated the Carlson model at least into 2008, if not later. *See supra* pp. 3-6. And the question for the Court is the value of the property in 2011, not 2006. While it may be true that the model output (e.g., of projected coal reserves, quality, etc.) did not significantly change over those five years, it may have. Over that time, Mr. Robinette input new and updated data he learned from the field into the model and presumably came up with a more accurate depiction of the Spruce No. 1 mine. *See* ECF No. 119-3 at 58:1-17, 60:5-63:15. In fact, for the neighboring mine where Eagle Creek was mining, Mr. Robinette created analyses of "what Eagle Creek was actually mining [compared] to what had been projected." *Id.* at 91:2-98:3. Further, Mr. McDaniel testified that he understood the financial projections to rely upon "2008-era" modeling. ECF No. 119-2 at 53:6-13. Therefore, the fact that Plaintiffs choose to rely upon 2006 modelling for their damage calculations does not negate the relevance or need for the updated models created after 2006.

Plaintiffs' final argument requires little attention. They propose that because they do not have the spoliated data either, the Government is not harmed because all parties have the same data available to them. ECF No. 128 at 19. While Plaintiffs are correct that no party has access to the spoliated data, their argument would, taken to its logical conclusion, necessarily mean that there could never be a spoliation sanction (except, perhaps, in cases involving intentional destruction of data under Rule 37(e)). That is not the law. *See 4DD Holdings, LLC*, 143 Fed. Cl. at 130 ("Spoliation occurs when a party destroys or materially alters relevant evidence that it had a duty to preserve.").

                b)       *Morgan Report Analyses*

The Government alleges that the missing Mingo Logan analyses of the Morgan Report prejudice it because the analyses are essential to evaluating Plaintiffs' investment-backed expectations and the economic impact of the EPA's § 404 action. ECF No. 119 at 21-22. Plaintiffs respond that the Government will not suffer prejudice from the missing Morgan Report analyses "because the Morgan Report has no bearing on the company's investment-backed expectations during the relevant time period under *Penn Central*." ECF No. 128 at 19-23.

13

The Court will leave for another day the question of the investment-backed expectations because, as discussed in oral argument, there is a brewing dispute as to what the relevant time frame for the reasonableness of the investment-backed expectations is. But there can be no doubt that Mingo Logan's contemporaneous analyses of the Morgan Report or other alternatives to discharging spoil into the Pigeonroost and Oldhouse Branch streams is relevant to any damage calculation in this case.

2.  The Government's requested sanctions remedy the prejudice it faces

The Court must now determine what sanctions remedy the prejudice faced by the Government due to the spoliated data and documents. Here, the Court finds Judge Bruggink's analysis in *4DD* particularly appropriate. In *4DD*, the plaintiffs alleged the government violated a license agreement when it purchased a limited number of software licenses but installed the software of far more computers than it had licenses for. *4DD Holdings, LLC*, 143 Fed. Cl. at 121. Approximately four months after plaintiffs filed their complaint, the government deleted the servers onto which it copied the software and erased the software from multiple laptops as well. *Id.* at 130. Here too, Mingo Logan deleted Mr. Robinette's files about four months after this complaint was filed. In *4DD*, plaintiffs filed a motion for a variety of spoliation sanctions, including a default judgment, adverse inference, preclusion from cross-examination, preclusion from submitting secondary evidence, and preclusion of any argument that evidentiary gaps should be construed in the spoliator's favor. *Id.* Plaintiffs also requested fees and costs for bringing the sanctions motion and for additional necessary discovery. *Id.*

Like Mingo Logan, in *4DD* the government claimed that it did not spoliate the evidence because "the information that has been lost can be replaced by other discovery." *Id.* at 132. Judge Bruggink disagreed, stating that the information offered in replacement was "partial and cannot offer a comprehensive, reliable picture." *Id.* at 132. As discussed above, the same is true here because it is not clear that the data Mingo Logan produced can easily or reliably be tied to specific versions of models. Unlike *4DD*, the Government here does not seek an adverse inference about the spoliated evidence, so the Court need not assess the willfulness of Mingo Logan's conduct.

Given the significant similarities to *4DD*, the Court concludes that it provides the proper framework to address the appropriate remedy. In this case, the Government proposes that this Court preclude Plaintiffs from using unproduced Carlson mine model .GRD files, unproduced Morgan Report analyses, or evidence derived from the lost .GRD files or analyses. ECF No. 119 at 23. According to the Plaintiffs, the Government's requests should be denied because the conduct was not intentional and the Government's requested "draconian sanctions" are "tantamount to those reserved for intentional conduct, vastly exceed[ing] what is necessary to cure any prejudice here." ECF No. 128 at 13-14. Not so. As an initial matter, the Government's requested sanctions are nowhere near as draconian nor close to those reserved for intentional conduct. RCFC 37(e)(2) limits certain sanctions to cases where the Court finds that the spoliating "party acted with the intent to deprive another party of the information's use in litigation." But these sanctions are a presumption that the destroyed data was unfavorable to the spoliating party, default judgment, and dismissal of the action. RCFC 37(e)(2). The Government asks for nothing tantamount to (or even approaching) these sanctions. To the contrary, the Government seeks to preclude the Plaintiffs from relying on data that Mingo Logan

14

failed to preserve and did not produce to the Government. Nothing could be more reasonable. It is hard to see how this sanction is much more than prohibiting Mingo Logan from using data it did not produce regardless of the reason—*i.e.*, the issue is not willful spoliation but the non-production of data. As for evidence derived from the lost data, including the ArcLand model, the Court will defer on precluding such evidence until it is introduced at summary judgment or at trial.

The Government also requests fees and costs for expenses stemming from the McDaniel and Robinette depositions, efforts to reconstruct or locate the lost evidence, and preparing the sanctions motion. ECF No. 119 at 24-25. Plaintiffs respond that "costs associated with the depositions of John McDaniel or Frank Robinette" would have been incurred "even in the absence of the spoliation" and should not be granted. ECF No. 128 at 25. While it is true that the Government almost certainly would have deposed both Mr. Robinette and Mr. McDaniel on the underlying facts of the case during discovery, the Court agrees with the Government that these two depositions were narrowly focused on spoliation issues and would not have been necessary but for Mingo Logan's spoliation. ECF No. 130 at 20. Therefore, the Court agrees that reasonable costs are appropriate. And for the avoidance of doubt, the Court will allow the Government a full deposition of both Mr. Robinette and Mr. McDaniel on the underlying factual issues of this case.

3. Applicability of the sanctions

Plaintiffs correctly observe that Mingo Logan was the spoliator, but that the Government requested sanctions against both Plaintiffs. *See* ECF No. 128 at 12 n.27 (citing ECF No. 119 at 23) ("The Government's request for sanctions seems principally directed at Mingo Logan. But there are times when the Government seems to be seeking relief against United, too."). As the Government confirmed at oral argument, the Government is "asking for Plaintiffs to be barred, and both Plaintiffs here, because even though Mingo Logan destroyed the documents, if United could use this evidence as, you know, as a co-defendant here, it would sort of subvert the whole point." ECF No. 132 at 22:24-23:3. Plaintiffs respond that the Court cannot "sanction a party (*i.e.*, United) that is not alleged to have been involved in the alleged spoliation." ECF No. 128 at 12 n.27. Specifically, Plaintiffs rely upon authority that the Court may not apply an adverse inference to a spoliator's co-plaintiff. *E.g.*, *Zhi Chen v. Dist. of Columbia*, 839 F. Supp. 2d 7, 16 (D.D.C. 2011); *Estate of Hill v. NaphCare Inc.*, 2022 WL 1464830 at *14-16 (E.D. Wash. May 9, 2022). But this Court is not granting an adverse inference that would unduly prejudice United Affiliates. As explained above, this Court is merely prohibiting reliance on spoliated data. Thus, it only makes sense to prohibit both Plaintiffs from doing so. This should impose little to no hardship on United Affiliates because it presumably has no Mingo Logan data that Mingo Logan failed to preserve.

The same is not true for the monetary sanctions. Because the additional depositions and expert work are only necessary because of Mingo Logan's spoliation, it is not appropriate to impose those sanctions on United Affiliates and the Court does not do so. *See Bonilla v. Volvo Car Corp.*, 150 F.3d 88, 93-94 (1st Cir. 1998) (reversing sanction of fees and costs against a party that did not participate in the spoliation). Indeed, it does not appear that the Government seeks monetary sanctions against United Affiliates. *See* ECF No. 130 at 19-20 (observing that the Government expended "significant attorney and expert hours and cost to discover what had

occurred" due to "Mingo Logan's destruction of Mr. Robinette's hard drive and other materials"). And there is nothing in the record indicating that United Affiliates had anything to do with the spoliation here, making a monetary sanction against it improper. Therefore, the fees for the Robinette and McDaniel depositions and the added expert costs to attempt to reconstruct lost data shall be borne by Mingo Logan alone because United Affiliates appears to have played no role in the spoliation.

## IV.     CONCLUSION

For the foregoing reasons, the Court **GRANTS-IN-PART** the Government's motion for sanctions and awards the Government fees and costs against Mingo Logan. The Government is directed to file an appropriately supported motion seeking a recovery of fees and costs related to the motion for sanctions after discovery concludes. The Court also precludes Plaintiffs from relying on data that Mingo Logan spoliated in this matter. Finally, the Court will defer ruling on documents derived from spoliated data to summary judgment or trial.

**IT IS SO ORDERED.**

s/Edward H. Meyers<br>
Edward H. Meyers<br>
Judge